**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| CINDY WHITEHEAD, | : | Case No. 1:19-cv-293 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| ORKIN, LLC, | : | |
| | : | |
| Defendant. | : | |

---

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This case is before the Court on Defendant Orkin, LLC's motion for summary judgment on all claims brought by Plaintiff Cindy Whitehead (Doc. 22). Whitehead brings four claims: two disability discrimination claims, under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), and R.C. 4112.02(A); and two claims under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), one for interference and another for retaliation. Upon review of the record and the parties' briefs, the Court **GRANTS** the motion for summary judgment in full.

### FACTS

Orkin provides residential and commercial pest control services. In July 2016, Orkin hired Whitehead as a Customer Service Specialist at its Cincinnati branch. She reported to Daryl Brown, who was the branch manager. The regional manager for the Kentucky region (which includes the Cincinnati branch) was Ken Harris. At the end of 2016, Whitehead was promoted to Office Manager. In both her starting role and her

managing role, she answered telephone calls from customers. (Doc. 22-2, Pg. ID 777-78; Doc. 28-1, Pg. ID 907.)

In December 2016, a customer complained that Whitehead had laughed at her on the phone. Brown and Harris asked her to call the customer back and apologize. She called the customer and said she regretted what had happened. (Doc. 22-2, Pg. ID 778-79, ¶¶ 10-15; Doc. 28-1, Pg. Id 908, ¶¶ 10-15.) Whitehead's personnel records reflect that, around May 2017, another customer, C.S., told Orkin that Whitehead "was short and rude speaking to her as if she was unimportant." (Whitehead Dep. Ex. 24, Doc. 18-1, Pg. ID 399-400.) The record notes that "[t]his cannot become a pattern our customer [sic] are too important to us to have them perceive that we as a company do not care." (*Id.* at 399.) In August that year, Orkin received a complaint from the husband of another customer, P.S., regarding an interaction she had had with Whitehead the day before. P.S. had commented that she did not appreciate Whitehead's "tone." Her husband called Orkin's regional office the next day, stating that Whitehead was rude to his wife and tried to hang up on her. (Doc. 22-2, Pg. ID 781, ¶¶ 31-33; Doc. 28-1, Pg. ID 909, ¶¶ 31-33.) Whitehead's personnel record reflected "[p]oor customer service" and that the customer wanted to cancel her service with Orkin. (Whitehead Dep. Ex. 26, 27, Pg. ID 401-02.) The record cautions that a potential consequence in "continuing current behavior" was "[f]urther discipline up to and including termination." (*Id.* at Pg. ID 401.)

Whitehead suffers from diverticulitis. And, throughout this time, she registered several absences from work. When she experiences flare-ups, or "obstructions," she endures vomiting or nausea and difficulty in walking, caring for herself, and working

2

generally. (Whitehead Dep., Doc. 18, Pg. ID 201-02.) Her personnel records reflect that in March 2017 it was noted she had missed 15 days of work from January to March. (Whitehead Dep. Ex. 19, Doc. 18-1, Pg. ID 389.) By July she had missed 8.5 more days. (*Id.* at Ex. 15, Pg. ID 357.) She received a written warning. (Doc. 28-1, Pg. ID 909, ¶ 22.) After receiving the July 2017 warning, she told Brown and Wanda Wallace, the area manager, that she suffered from diverticulitis. (Doc. 22-2, Pg. ID 780, ¶ 23; Doc. 28-1, Pg. ID 909, ¶ 23.) She reached out to Catherine Smith, the human resources director. Smith encouraged Whitehead to apply for intermittent leave under the Family and Medical Leave Act, or FMLA, for absences related to her diverticulitis.

Orkin approved her request for intermittent FMLA leave. Whitehead worked with Kandice Toney regarding her FMLA leave. (Doc. 22-2, Pg. ID 780, ¶¶ 25-29; Doc. 28-1, Pg. ID 909, ¶¶ 25-29.) That September, she exhausted her intermittent leave. Toney advised her that she had to provide a new certification from her doctor. Whitehead did so and requested continuous FMLA leave beginning September 11, 2017. Orkin approved this request too. (Doc. 22-2, Pg. ID 782, ¶¶ 38-40; Doc. 28-1, Pg. ID 910, ¶¶ 38-40.)

A personnel record dated September 12, 2017—while Whitehead was on leave—shows that another customer complaint reached Orkin. The phone call had taken place on August 30, before Whitehead had taken the leave beginning September 11. (Whitehead Dep., Doc. 18, Pg. ID 273-74; Whitehead Dep. Ex. 29, Doc. 18-1, Pg. ID 406.) A customer, P.J., called to talk to a service manager because she felt that Whitehead "was refusing to allow her to talk to a manager and felt that Cindy was rude and short."

(Whitehead Dep. Ex. 28, Doc. 18-1, Pg. ID 405.) She was "very upset and finally hung up and Cindy called her back to finish her sentence." (*Id.*) The customer felt that Orkin was not interested in talking with her or helping her and cancelled the service. (*Id.*)

The September record about the August 30 call also stated that "Cindy continues to have conflict with customers," which had "become a regular unfortunate situation." (Whitehead Dep. Ex. 28, Doc. 18-1, Pg. ID 405.) It noted that "Cindy has proven over the last 9 months she has difficulty with customer service." (*Id.*) Customers "continue to express their Perception and with it being repetitive it has become a reality and when discussed Cindy . . . denies that she has continued problems in situation [sic] that may require simple patience and empathy to resolve the smallest of custom[er] concerns." (*Id.*) The record concludes that, "[w]ith the continued customer complaints I find it advisable that we terminate Cindy from her . . . position." (*Id.*)

Orkin permitted Whitehead to complete her medical leave. She returned to work on December 4, 2017. She met with Wanda Wallace, Daryl Brown, and Brad Trovillo, a service manager. At that meeting, Wallace told her that Orkin had received two more customer complaints about her, and that Orkin was terminating her employment. (Doc. 22-2, Pg. ID 783-84, ¶¶ 53-56; Doc. 28-1, Pg. ID 912, ¶¶ 53-56.)

## ANALYSIS

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

4

(1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point out specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to plumb the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). A "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy,* 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Ohio courts analyze state disability discrimination claims under the federal framework, so the Court first considers those two claims together. The Court will then proceed to the FMLA claims.

## I.    Disability Discrimination

Ohio disability discrimination law, R.C. § 4112.02(A), generally applies the same analysis that applies in ADA cases. *Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1059 (S.D. Ohio 2020); *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 573, 697 N.E.2d 204, (1998). The ADA prohibits employers from discriminating against an employee "because the employee is disabled, because the employee has a record of being disabled, *or* because the employer 'regards' the employee as disabled." *Babb v. Maryville*

5

*Anesthesiologists P.C.*, 942 F.3d 308, 318 (6th Cir. 2019) (citing 42 U.S.C. §§ 12102(1), 12112(a)). To establish a prima facie case of disability discrimination, a plaintiff must show that (1) she is disabled, (2) she was otherwise qualified for the position, with or without reasonable accommodation, (3) she suffered an adverse employment decision, (4) the employer knew or had reason to know of her disability, and (5) the position remained open while the employer sought other applicants. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016). If the employee can meet this "not onerous" requirement, then the employer must provide a legitimate explanation for its action, which is also not an onerous burden to satisfy. *Babb*, 942 F.3d at 320. And, once the employer provides a legitimate reason for terminating the employee, the burden shifts back to the employee to introduce evidence that the employer's explanation is pretextual. Importantly, to avoid summary judgment, the employee does not need to prove that the employer's proffered rationale is pretextual—she just needs to prove that a genuine issue of material fact exists as to whether that rationale is pretextual. *Id.*

The Court proceeds on the assumption that Whitehead has proven her prima facie case. Orkin too satisfies its burden of showing that it terminated Whitehead for a legitimate, nondiscriminatory reason: her continuous unprofessional interactions with customers, beginning in December 2016 and culminating in the August 30, 2017 customer complaint. These calls established a pattern of "conflict with customers." (Whitehead Dep. Ex. 28, Pg. ID 405.) These conflicts compromised Orkin's client base. Terminating an employee for poor customer service is legitimate and nondiscriminatory. *Thompson v. Chase Bankcard Servs., Inc.*, 737 F. Supp. 2d 860, 875 (S.D. Ohio 2010). Consequently, the

burden shifts back to Whitehead to show that this reason is pretextual.

### A. Pretext

The fundamental question in the pretext analysis is: Did the employer make the adverse employment decision for the stated reason or not? *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). A plaintiff must produce sufficient evidence such that a reasonable jury could doubt the employer's stated reason for its actions. *McCart v. Univ. of Cincinnati Found.*, No. 1:08-CV-656, 2010 WL 1433309, at *7 (S.D. Ohio Apr. 7, 2010). Plaintiffs often attempt to refute an employer's proffered legitimate reason by showing that the reason (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

Whitehead makes two arguments in her attempt to establish pretext. First, she argues that pretext lies in Orkin's shifting narrative for her termination and conflicting testimony regarding the decisionmakers' identities. Second, she contends that a reasonable jury could conclude that Orkin's proffered reasons for her termination did not actually motivate her termination.

#### 1. Shifting narrative

Whitehead argues that Darryl Brown, manager of the Cincinnati branch, changed his narrative as to why Orkin fired her. She asserts that, according to Brown's testimony, Ken Harris and Wanda Wallace terminated Whitehead at least in part due to her attendance. Some of Brown's testimony reflected that Harris and Wallace indicated that they needed "somebody in place, needing somebody who could handle the

conversations with customers and . . . be there to take care of the actual office staff." (Brown Dep., Doc. 19, Pg. ID 483.) Brown's testimony, in Whitehead's view, supports the position that her attendance contributed to her termination.

It is true that Brown identified Wallace and Harris generally as decisionmakers when he testified, "There's not a decision that is made or anything happens without the region staff, being Ken Harris and Wanda Wallace at that time. So anything that was done, that was decided, anything that was pursued, came from their directives." (Brown Dep., Doc. 19, Pg. ID 461.) But the testimony of those individuals shines more detailed light on Brown's testimony. When asked who ultimately made the decision to terminate Whitehead, Ken Harris testified, "I did." (Harris Dep., Doc. 21, Pg. ID 740.) His declaration reflects the same. (Harris Dec., Doc. 22-1, Pg. ID 775-76, ¶ 5.) And Wanda Wallace, although she was part of conversations about Whitehead's termination, expressly denied that she was involved in the decision about her termination. She testified, "That would have been above my level." (Wallace Dep., Doc. 25, Pg. ID 811.) She believed that it was a "collaborative decision" to terminate Whitehead, involving Harris, Brown, and Catherine Smith. (*Id.* at Pg. ID 812.) Smith, however, denied making the decision—she said it was Ken Harris and Darryl Brown. (Smith Dep., Doc. 20, Pg. ID 611.) And, of those two, Harris is the only one who expressly claimed that he had the decision-making role when it came to Whitehead's termination. Brown disclaimed any decision-making involvement in that matter. (Brown Dep., Doc. 19, Pg. ID 479.) Thus, the deposition testimony shows that Harris was the one who made the decision to terminate Whitehead.

8

Here, even when we look at Brown's testimony more closely, it does not reveal a shifting justification, as Whitehead claims. He testified that, with respect to Whitehead being sick, "I don't think that that was their motive, to get ride of her for that purpose. I think it really truly started because there was so much confrontation with customers and things like that." (*Id.* at Pg. ID 483-84.) He testified that Wallace spoke with Whitehead but Whitehead "didn't seem to be real receptive to anybody telling her that customers complained about her." (*Id.*) Further, when asked if he had conversations with Wallace and Harris about the decision to terminate Whitehead, he responded, "I'm sure we had conversations, but what I have to say about it really had nothing—I mean it wouldn't have made a difference." (*Id.* at Pg. ID 482.) Upon close inspection, then, Brown's testimony is consistent with Orkin's argument that the basis for terminating Whitehead was the recurring issue with customer complaints.

This situation differs from cases Whitehead cites in support of her case. Here, the record shows that Ken Harris made the decision to terminate Whitehead. There are no genuine questions of fact as to who the decisionmaker was, unlike in *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997). Nor is there serious doubt as to why she was fired, as in *Laws v. HealthSouth N. Kentucky Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404, 409 (6th Cir. 2012). Consequently, there is no issue of fact to be determined regarding those issues, and summary judgment is appropriate. But here, even if there was a factual question as to who made the decision and for what reason, Whitehead has not pointed to anything that tends to show that the real reason she was terminated was related to disability discrimination. For these reasons, Whitehead's argument here fails. *Irvin v.*

9

*Airco Carbide*, 837 F.2d 724, 726 (6th Cir. 1987).

### 2. "Did not actually motivate"

Whitehead next argues that a reasonable jury could conclude that Orkin's proffered reasons for her termination did not actually motivate her termination. She denies receiving progressive discipline, which Orkin generally uses. She also disputes the reliability of Orkin's business records.

*Progressive discipline.* Whitehead claims that Orkin generally ascribes to a progressive discipline policy before terminating employees. (Smith Dep., Doc. 20, Pg. ID 612-13; Brown Dep., Doc. 19, Pg. ID 523.) But she claims she never actually received some or any of the coaching following some of the customer complaints. This failure to administer the progressive discipline, in her view, could lead a jury to doubt Orkin's stated reasons for terminating her.

However, "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005). Such a failure may, when combined with other evidence, may have some probative value—but as a general rule, an employer's failure to follow its own policies does not by itself establish pretext. *Marshall v. Belmont Cty. Bd. of Comm'rs*, 110 F. Supp. 3d 780, 791 (S.D. Ohio 2015).

Whitehead does not provide evidence that Orkin was required to follow the progressive discipline policy. Brown's testimony showed that Orkin "tried to use" progressive discipline. (Brown Dep., Doc. 19, Pg. ID 523.) Similarly, Smith's deposition testimony indicates that progressive discipline was aspirational and situational, even

"important," but not a hard and fast rule. (Smith Dep., Doc. 20, Pg. ID 612-15, 622.)  Thus,

here, even if Orkin deviated from a general policy of progressive discipline, that does not

raise the inference of pretext, because that policy is not required in the first place.  *See*

*Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 897 (6th Cir. 2020).

    *Conflicting business records.*  Orkin points out that Whitehead's personnel records

reflect a pattern of customer complaints.  Whitehead argues that these records conflict

with each other.  Most of this argument, however, is a repeat of her argument above that

she did not receive coaching or counselling prior to being terminated.  But any probative

value the lack of coaching has is outweighed by the lengthy record of customer

complaints about Whitehead's customer service on the phone.  She offers no evidence

from the record that amounts to an inference that Orkin's stated reason for firing her was

a pretext *for disability*.  Her argument is more of a "blanket denial" of the basis Orkin had

for firing her.  *Irvin*, 837 F.2d at 726.  That is not enough.  Because she does not present

evidence that shows that "the reasons given are an attempt to cover up the employer's

alleged real discriminatory motive," this argument fails.  *Id.*

*    *    *

    None of Whitehead's arguments succeeds in avoiding summary judgment.  For

the reasons laid out above, the Court grants summary judgment on her state and federal

disability claims.

## II.    FMLA Interference

    To prove an FMLA-interference claim, a plaintiff must demonstrate that (1) she

was an eligible employer, (2) the defendant was an employer as defined under the FMLA,

11

(3) the plaintiff was entitled to leave under the FMLA, (4) she gave the employer notice

of her intention to take leave, and (5) the employer denied (or interfered with) FMLA

benefits to which the employee was entitled. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th

Cir. 2014). Employees who seek relief under the interference theory must also establish

that the employer's violation caused them harm. *Id.*

Orkin argues that Whitehead's interference claim fails for the simple reason that

she was granted all the medical leave she requested. At her deposition, Whitehead was

asked if she "ever request[ed] medical leave from Orkin that was not granted."

(Whitehead Dep., Doc. 18, Pg. ID 225.) She answered, "No." (*Id.*) This, Orkin argues,

means Whitehead cannot prove the fifth element of an FMLA-interference claim.

Whitehead acknowledges in her response that she does not oppose Orkin on the FMLA-

interference claim. (Doc. 28, Pg. ID 887, n. 1.) The Court thus grants summary judgment

on the FMLA-interference claim.

### III. FMLA Retaliation

Courts analyze FMLA-retaliation claims under the familiar three-part burden-

shifting framework. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). In order to

establish an FMLA discrimination claim, Whitehead must demonstrate that: (1) she was

engaged in an activity protected by the FMLA; (2) the employer knew that she was

exercising her rights under the FMLA; (3) after learning of the employee's exercise of

FMLA rights, the employer took an employment action adverse to her; and (4) there was

a causal connection between the protected FMLA activity and the adverse employment

action. *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). If she does

this, then the burden shifts to Orkin to present a legitimate, non-retaliatory reason for terminating her. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 284 (6th Cir. 2012). If Orkin does that, then the burden shifts back to Whitehead to show that the proffered reason was a pretext for unlawful discrimination. *Bryson*, 498 F.3d at 570.

As with the disability claims, the Court will proceed on the assumption that Whitehead can prove her prima facie case. And Orkin's legitimate nondiscriminatory reason for terminating her remains the history of customer complaints. It falls to Whitehead to demonstrate pretext.

As with disability cases, FMLA plaintiffs often attempt to establish pretext by showing that the employer's proffered reasons have no basis in fact, did not actually motivate the action, or were insufficient to warrant the action. *Seeger*, 681 F.3d at 285. Whichever method used, Whitehead bears the burden of producing sufficient evidence from which they jury could reasonably reject the employer's explanation and infer discrimination instead. *Id.*

Whitehead argues that it was only after she requested FMLA paperwork and told Wallace and Brown of her diverticulitis that Orkin escalated her discipline. Thus, it appears she attempts to argue that the customer complaints did not actually motivate Whitehead's termination. She contends that the scrutiny placed on her increased following her protected activity. She draws a comparison to the facts in *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009). In *Hamilton*, the plaintiff claimed that he was terminated in retaliation for filing a claim with the Equal Employment Opportunity Commission ("EEOC"). He argued that after his EEOC filing, his employer increased its

13

surveillance of his work and waited for a chance to fire him. Because of the temporal proximity between the protected activity and the employer action, the Sixth Circuit found that a causal nexus existed between the two.

The difference between that case and this one is that *Hamilton* addressed temporal proximity in the context of a prima facie case but, here, we are dealing with pretext. Even *Hamilton* acknowledged that circuit precedent generally held that temporal proximity was not enough to satisfy the causation element of a prima facie case. With pretext, however, "[u]nlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" *Seeger*, 681 F.3d at 285. Whitehead does not produce evidence tending to show that the numerous complaints from December 2016, February 2017, April 2017, and August 2017 did not happen, were insufficient to warrant termination, or did not actually motivate Orkin to resolve their customer conflict problems by terminating Whitehead. And, to the extent she advances the same additional pretext arguments in the FMLA-retaliation claim as she did in the disability claims, those arguments fail for the same reasons as they do in the disability context.

Accordingly, the Court grants summary judgment on Whitehead's FMLA-retaliation claim.